**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

FRANCISCO CURBELO, a/k/a Murando,
*Defendant-Appellant.*

No. 02-4194

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

FRANCISCO CURBELO, a/k/a Murando,
*Defendant-Appellant.*

No. 02-4247

Appeals from the United States District Court
for the Western District of North Carolina, at Charlotte.
Graham C. Mullen, Chief District Judge.
(CR-99-109-MU)

Argued: April 3, 2003

Decided: September 11, 2003

Before WILKINS, Chief Judge, and MOTZ and
KING, Circuit Judges.

---

Vacated and remanded by published opinion. Judge King wrote the
majority opinion, in which Judge Motz joined. Chief Judge Wilkins
wrote a dissenting opinion.

---

**COUNSEL**

**ARGUED:** Lisa S. Costner, LISA S. COSTNER, P.A., Winston-Salem, North Carolina, for Appellant. Gretchen C.F. Shappert, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

---

**OPINION**

KING, Circuit Judge:

On July 13, 2001, an eleven-person jury convicted Francisco Curbelo of multiple counts related to a drug distribution ring that operated out of Charlotte, North Carolina. Curbelo has asserted several possible grounds for reversal, including the district court's decision to proceed, over his objection, with eleven jurors. The Government concedes that the court erred in proceeding with an eleven-person jury, but it asserts that the error was harmless and that Curbelo's convictions should therefore be affirmed. Every court to have addressed the question has held to the contrary, and we decline to deviate from this consensus. Thus, we vacate Curbelo's convictions and remand for a new trial, without reaching his other assertions of error.

I.

On July 13, 1999, a grand jury in the Western District of North Carolina returned its initial indictment against Curbelo, charging him with multiple drug and firearms violations. A superseding indictment was returned on February 6, 2001, and it serves as the basis for his convictions. The superseding indictment alleges that Curbelo and others engaged in a drug conspiracy between January 1996 and June 1999. Count One of the superseding indictment charged Curbelo with a controlled substances conspiracy, in violation of 21 U.S.C. § 846; Counts Two, Four, Five, Seven, Nine, and Eleven charged him with possession with intent to distribute cocaine base, in contravention of 21 U.S.C. § 841; and Counts Three, Six, Eight, Ten and Twelve charged him with possession of firearms in relation to drug trafficking offenses, in violation of 18 U.S.C. § 924(c).

On July 9, 2001, a jury of twelve was impaneled for Curbelo's trial.[1] The jurors were sworn shortly after 4 o'clock that afternoon, and counsel for both sides then presented their opening statements. The Government then called its first and principal witness, an alleged co-conspirator, Thurnell Williams. At approximately 5:00 p.m., the trial was adjourned for the day, resuming the next morning around 9:30. At about 5 o'clock on the afternoon of July 10 — after Williams had completed his direct testimony, but not his cross-examination — court was adjourned early because of an air conditioning problem in the courthouse.

On the morning of July 11, 2001, before the start of the third day of what would be a five-day trial, the court informed the parties that "[o]ne of our jurors has called in sick and will have to be excused." In response, the prosecution suggested that the parties stipulate to proceeding with only eleven jurors. Although Curbelo declined to so stipulate, the court nevertheless announced:

> It appears that the Court finds it necessary to excuse one juror for just case [sic] after the trial commences. [The juror's] father having called in and reported she's suffering from irritable bowel syndrome and is totally unable to function. She has been instructed to report to court with a doctor's certificate after she recovers from whatever this is. But I believe the Court has discretion to proceed with 11 absent the stipulation, and we will proceed.

Thus, the court ruled, over Curbelo's objection, that his trial should proceed with eleven jurors, even though the trial was still in its infant stages — with the first witness still on the stand.

That witness, Thurnell Williams, provided a good deal of the evidence against Curbelo. Williams, who supported himself by selling crack, testified that on several occasions, from late 1996 through June 1999, he purchased illegal narcotics from Curbelo. Around the end of 1998 or the beginning of 1999, Williams stopped dealing with Curbelo because he owed and could not repay Curbelo $12,000, appar-

---

[1]The court did not impanel any alternate jurors for Curbelo's trial.

ently for illegal drugs. Later in 1999, when law enforcement agents "repeatedly" told Williams that he was "a target of a federal investigation," he agreed to "assist the government and become an informant." Working with the agents, Williams started dealing with Curbelo again. Because Curbelo did not speak much English, various people, including a man named Jose, helped Williams negotiate with Curbelo. According to Williams, the purchases often took place in Curbelo's phone store, with Jose's translation and assistance. (Jose worked for Curbelo at the store.) Further, Williams testified that Curbelo kept a microwave and firearms in the back of the store, where he sometimes microwaved the cocaine into crack. During several of his interactions with Curbelo, Williams wore a wire and a video camera; the Government played these tapes, and provided photographs and transcripts of these meetings to the jurors.

Williams acknowledged that during the 1990s he was convicted and imprisoned in Florida for assault, trafficking in cocaine and possession of a firearm during the commission of a felony, and that in July 1999 (after he had begun work for law enforcement) he was convicted of theft and possession of a firearm. On cross-examination, defense counsel asked Williams about (1) his failure to mention Curbelo's possession of guns in his initial reports to police; (2) a confidential informant's statement that contradicted a portion of Williams's testimony; and (3) an allegation that Williams had purchased a cellular phone from Curbelo's store and that Williams's unpaid debt was actually owed in connection with that purchase, rather than for illegal drugs.

Regarding his interactions with Curbelo, Williams admitted that on multiple occasions Curbelo explicitly refused to provide him with any cocaine, stating that he only had access to marijuana. Williams also acknowledged that Jose actually "handed" him "the drugs" every time he purchased them while working with law enforcement officers. On the first such occasion, June 15, 1999, Jose told him that Curbelo would not be there and to "talk to him [Jose]." The next day when Williams called, Curbelo again was away from the store, and Williams asked Jose for cocaine; in paying for the cocaine, Williams attempted to hand the money to Curbelo (as instructed by the agents), but Jose took the money and counted it himself. Williams also agreed that the "other times that [he had] s[aid] [he] saw Mr. Curbelo cook-

ing cocaine or the other times that [he] [said] [he] dealt with Mr. Curbelo, none of that is actually documented on tape or a transcript or audiotape or anything like that." And, "[t]here is no physical evidence of any of those transactions at all."

Six other alleged drug dealers or co-conspirators testified more briefly; most were imprisoned and testified under plea agreements. On direct examination, they corroborated various aspects of Williams's testimony; on cross-examination they contradicted themselves and each other on some issues. For example, one of the other witnesses testified in detail that, with Williams's knowledge and encouragement, he had robbed Curbelo's store and kidnaped Curbelo's girlfriend, Wendy. However, when Williams testified, he had denied knowing anything about the robbery or kidnaping.

In addition, two Government agents testified;[2] they related their conversations with Williams and observations of Curbelo. They acknowledged that no law enforcement officers accompanied Williams into Curbelo's store, that other than what was shown on video, they could not see what was happening in the store, that the quality of some of the video was "poor," and that the video did not "show who was actually transferring the drugs." Furthermore, they admitted that on the tapes, Williams's references to drugs ("ounces") were only made when he was talking to Jose, and that when he talked about paying down his debt to Curbelo, he "never ma[de] a reference to drugs." Finally, they conceded that Williams had not been charged with Wendy's kidnaping, or the robbery of Curbelo's store, or his drug dealing in North Carolina prior to his cooperation with law enforcement authorities, or his possession of a firearm by a convicted felon.

Curbelo took the stand in his own defense and testified through an interpreter. According to Curbelo, in January 1999, Williams started coming to Curbelo's recently opened store to look at some of the

---

[2]The Government also presented the testimony of an interpreter, who reviewed the transcripts of the tapes prepared for the jury; the interpreter testified that there were some omissions in the transcripts, but that they were "well over 95 percent correct." He acknowledged that the tapes were noisy and that it was "difficult to maintain whom is talking to whom."

phones. Williams was "very insistent about drugs," "always telling [Curbelo] that he knew people in New York [who] had drug sources." Curbelo, however, denied ever selling drugs to Williams. Curbelo's lawyer asked Curbelo about one of the tapes on which it appeared that Curbelo was saying "kilo." Curbelo explained that the police did not respond after the robbery of his store, that he suspected Williams, and that he used the word "kilo" in an effort to set a trap for Williams to come back to the store and try to rob it again. He said that he later found out that Jose did give Williams drugs, but that he and Jose had only talked about "a pretend simulated drug business to try to trap" Williams and obtain evidence on him. Curbelo also testified that it was "impossible" that Williams saw him cooking crack cocaine in a microwave oven in the back of the store, because "Wendy was scared to death" of Williams and he and Wendy "would never have him go past the counter."

Curbelo acknowledged that he knew many of the witnesses who testified but denied that he dealt drugs with any of them. He testified that one of his alleged co-conspirators told him in the holding cell that his testimony against Curbelo "was nothing personal against [Curbelo], but he just wanted to get free," and that "they were going to give him his freedom for coming here and lying in his testimony." Curbelo also maintained that the tapes played to the jury were not accurate and had been edited and "tampered with."

The eleven-person jury returned its verdict on July 13, 2001, convicting Curbelo of the conspiracy count and of the six counts of possession with intent to distribute cocaine base. He was acquitted of all five firearms charges. On March 20, 2002, the court conducted a sentencing hearing. At the hearing, the district judge found that Curbelo had lied under oath at trial, but the judge also stated that he was "highly skeptical of some of the truthfulness of Mr. Williams, in particular in his inability to admit the truth that he had anything to do with the robbery." The court sentenced Curbelo to seven concurrent sentences of 360 months, plus seven concurrent terms of five-years of supervised release. Curbelo has appealed, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

Curbelo contends that he is entitled to a new trial because the district court, in the midst of his trial and without his consent, dismissed

one of his jurors and permitted eleven jurors to hear the evidence and decide his fate. In response, the Government concedes that the court did err in proceeding with an eleven-person jury, but it contends that the error was harmless and that Curbelo's convictions and sentence should be affirmed.

The Supreme Court has established various standards for determining when an error requires that a criminal defendant's conviction be vacated. For most constitutional errors, the Government must demonstrate that the error was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24 (1967). And for most nonconstitutional errors, the Government must demonstrate that the error did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos v. United States*, 328 U.S. 750, 776 (1946). Finally, some errors, involving "'structural defects in the constitution of the trial mechanism . . . defy analysis by "harmless-error" standards,'" because they are "necessarily unquantifiable and indeterminate." *Sullivan v. Louisiana*, 508 U.S. 275, 281-82 (1993) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 309 (1991)). Such errors always require invalidation of a judgment. *Id.* at 279. Determining the character of the error at issue in this case presents some difficulties.

Clearly this error violated Fed. R. Crim. P. 23(b), which entitles a defendant tried in federal court to a twelve-person jury. At the time of Curbelo's trial, Rule 23(b) provided that:

> Juries shall be made of 12 but at any time before verdict the parties may stipulate in writing with the approval of the court that the jury shall consist of any number less than 12 or that a valid verdict may be returned by a jury of less than 12 should the court find it necessary to excuse one or more jurors for any just cause after trial commences. Even absent such stipulation, if the court finds it necessary to excuse a juror for just cause after the jury has retired to consider its verdict, in the discretion of the court a valid verdict may be returned by the remaining 11 jurors.

Fed. R. Crim. P. 23(b) (2002).[3] Pursuant to this Rule, Curbelo was

---

[3]Rule 23 was amended on December 1, 2002, "as part of the general restyling of the Criminal Rules to make them more easily understood."

entitled to be tried by a twelve-person jury, and the district court possessed no discretion — prior to deliberations — to conduct the trial with an eleven-member jury, absent Curbelo's consent.[4] Indeed, the Government candidly concedes that the court violated Rule 23(b) in proceeding, over Curbelo's objection, with eleven jurors.

In addition, the jury right embodied in Rule 23(b) unquestionably has constitutional dimensions. First, two provisions of the Constitution relate specifically to the right to trial by jury. Article III, § 2, cl. 3, provides: "The Trial of all Crimes . . . shall be by Jury." U.S. Const. Art. III, § 2, cl. 3. Similarly, the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. Amend. VI.

Moreover, the right to trial by jury has a long and venerable history. *See generally Duncan v. Louisiana*, 391 U.S. 145 (1968). Indeed, "by the time our Constitution was written, jury trial in criminal cases had been in existence in England for several centuries and carried impressive credentials traced by many to [the] Magna Carta." *Id.* at 151. Thus, the right to a jury trial was one of the most important protections placed in the Constitution. *See id.* at 149 ("[T]rial by jury in criminal cases is fundamental to the American scheme of justice."); *Patton v. United States*, 281 U.S. 276, 312 (1930) ("[T]he right of the accused to a trial by a constitutional jury [must] be jealously preserved."). Although the Supreme Court initially interpreted the Constitution to preserve the twelve-person jury safeguard as it was known at common law in all courts in the United States, *see Thompson v. Utah*, 170 U.S. 343, 350-51 (1898); *see also United States v. Va.*

---

*See* Fed. R. Crim. P. 23, Advisory Committee Notes to 2002 Amendments. The revisions were "intended to be stylistic only," *id.*, and they have no bearing on this appeal.

[4]The language of Rule 23(b) is clear and unequivocal. Strikingly, however, the Government advised us at oral argument that "nobody picked up a rule book," that "none of the lawyers read the Rule," and that "if the parties had read Rule 23(b), as opposed to relying upon their memories, we wouldn't have this issue before the Court."

*Erection Corp.*, 335 F.2d 868, 871 (4th Cir. 1964) ("Twelve is the magic number."), more recently it has held that the Sixth Amendment, as applied to the states through the Fourteenth, does not entitle a defendant tried in state court to a twelve-person jury. *See Williams v. Florida*, 399 U.S. 78, 89-90 (1970). In view of this holding and the fact that our court and other courts have upheld the constitutionality of Rule 23(b), *see, e.g.*, *United States v. Fisher*, 912 F.2d 728, 733 (4th Cir. 1990), we cannot conclude that the Sixth Amendment provides an unconditional right to a twelve-person jury in federal court.[5]

Significantly, however, neither the Supreme Court nor any federal appellate court has resolved whether the Due Process Clause permits the arbitrary deprivation of a defendant's right, guaranteed by Rule 23(b), to a twelve-person jury. Given the critical importance of twelve jurors at common law and Congress's particular care in Rule 23(b) to preserve that right, except in carefully limited circumstances, such a holding seems not unlikely. Indeed, in holding that Rule 31(a)'s jury unanimity requirement is constitutionally mandated, the Supreme

---

[5]We note, however, that the Supreme Court has never *held* that the Sixth Amendment does *not* require a twelve-person jury in federal prosecutions, and several members of the Court have rejected the view that "all elements of jury trial within the meaning of the Sixth Amendment are necessarily embodied in or incorporated into the Due Process Clause of the Fourteenth Amendment." *Johnson v. Louisiana*, 406 U.S. 356, 369 (1972) (Powell, J., concurring in that case and *Apodaca v. Oregon*, 406 U.S. 404 (1972)); *see Ballew v. Georgia*, 435 U.S. 223, 246 (1978) (Powell, J., concurring in judgment and joined by Burger, C.J., and Rehnquist, J.) (suggesting — in case involving the size of state court jury — that not "every feature of jury trial practice must be the same in both federal and state courts"). This has led Professor Wright to note that "it may well be that in federal court a jury of [12] is still constitutionally compelled." 2 Charles Alan Wright, *Federal Practice & Procedure* § 373, at 457 (3d ed. 2000). In addition, we note that many state constitutions contain a specific guarantee to twelve-person juries, obviating any need for a Sixth Amendment guarantee of this right in those states. *See, e.g.*, *State v. Henley*, 687 P.2d 1220, 1223 (Ariz. 1984) (Arizona); *Byrd v. State* 879 S.W.2d 435, 437 (Ark. 1994) (Arkansas); *State v. Poindexter*, 545 S.E.2d 414, 416 (N.C. 2001) (North Carolina); *State v. Stegall*, 881 P.2d 979, 981-82 (Wash. 1994) (Washington); *State v. Wyndham*, 92 S.E. 687, 687 (W. Va. 1917) (West Virginia).

Court has indicated that the right to a unanimous jury "is more accurately characterized as a due process right than as one under the Sixth Amendment." *Schad v. Arizona*, 501 U.S. 624, 634 n.5 (1991) (plurality opinion); *see also Apodaca v. Oregon*, 406 U.S. 404 (1972) (holding that defendant has constitutional right to unanimous jury verdict in federal court). Moreover, the Court has held that violations of state procedural rules can amount to violations of an individual's constitutionally-guaranteed right to due process. For example, in *Hicks v. Oklahoma*, 447 U.S. 343 (1980), the Court held that a state sentencing decision violated due process when the jury that imposed the sentence was not informed of its discretion, under state law, to impose a lower sentence. *Id.* at 346. According to the Court, this sentencing decision involved more than "the denial of a procedural right of exclusively state concern"; it was a violation of the fundamental right to due process. *Id.* Similarly, in *Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982), when a state denied a hearing to a complainant solely because a state official missed a state law deadline, the Court held the denial violated the complainant's due process rights. *Id.* at 432-34.

Fortunately, we need not resolve the knotty question of whether the error here is of constitutional dimension. This is so because, even if it is not, we must, for two independent reasons, vacate Curbelo's sentence. We discuss each in turn.

### III.

First, whether violative of the Constitution or not, the error here is structural, and such errors "invalidate the conviction" without any showing of prejudice. *Sullivan*, 508 U.S. at 279.[6]

---

[6]Despite occasionally suggesting in dicta that structural errors must implicate constitutional rights, *see United States v. Lane*, 474 U.S. 438, 446 n.9 (1986), the Supreme Court has clearly held that structural errors need not be of constitutional dimension. Indeed, the Court reached precisely this conclusion only a few months ago. *See Nguyen v. United States*, 123 S. Ct. 2130, 2137 (2003) (refusing to consider constitutional challenge and holding that violation of statute alone constituted plain error, requiring invalidation of conviction without showing of prejudice); *see also Gomez v. United States*, 490 U.S. 858, 876 (1989) (holding that

Structural errors affect the very "'framework within which the trial proceeds, rather than simply . . . the trial process itself.'" *Neder v. United States*, 527 U.S. 1, 8 (1999) (quoting *Fulminante*, 499 U.S. at 310). Examples of such errors include a total deprivation of the right to counsel, *see Gideon v. Wainwright*, 372 U.S. 335 (1963), lack of an impartial trial judge, *see Tumey v. Ohio*, 273 U.S. 510 (1927), an unlawful exclusion of grand jurors of defendant's race, *see Vasquez v. Hillery*, 474 U.S. 254 (1986), the right to self-representation at trial, *see McKaskle v. Wiggins*, 465 U.S. 168 (1984), the right to a public trial, *see Waller v. Georgia*, 467 U.S. 39 (1984), an erroneous reasonable-doubt instruction to the jury, *see Sullivan v. Louisiana*, 508 U.S. 275 (1993), and the seating of a juror who should have been removed for cause, *see United States v. Martinez-Salazar*, 528 U.S. 304, 316 (2000); *see also Neder*, 527 U.S. at 8 (collecting structural error cases (citing *Johnson v. United States*, 520 U.S. 461, 468-69 (1997))). It is because such errors "'infect the entire trial process'" that they require reversal without regard to the evidence in a particular case. *Neder*, 527 U.S. at 8 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 630 (1993)). The error here — depriving a defendant of the

violation of statute governing duties of federal magistrate judges required reversal without regard to actual prejudice); *Young v. United States*, 481 U.S. 787 (1987) (plurality opinion) (holding violation of right to disinterested prosecutor fundamental and avoiding constitutional issue; utilizing instead Court's supervisory authority to reverse); *United States v. American-Foreign S.S. Corp.*, 363 U.S. 685, 691 (1960) (holding that violation of statute governing en banc participation of circuit judges required judgment to be vacated without showing of prejudice). Contrary to our dissenting colleague's suggestion, *post* at 25, these cases do not involve jurisdictional issues; indeed, the Government specifically recognized that the error in *Nguyen* was *not* jurisdictional. *See* Brief for the United States in *Nguyen v. United States*, 123 S. Ct. 2130 (2003). Nor, notwithstanding the dissent's contention, has the Supreme Court ever held that "structural errors necessarily must affect a defendant's constitutional rights." *Post* at 23. The decisions relied on by the dissent for this proposition, *post* at 23-24, merely hold that not every constitutional error is a structural error; none holds that a structural error need be premised on a constitutional deprivation.

verdict of twelve jurors, without his consent or any finding of good cause — is such an error.[7]

Like other structural errors, the error here has repercussions that are "necessarily unquantifiable and indeterminate." *Sullivan*, 508 U.S. at 282. This is particularly true given the rules of evidence and the restrictions that they quite legitimately place on any inquiry into jury deliberations. *See generally Tanner v. United States*, 483 U.S. 107 (1987). We simply cannot know what affect a twelfth juror might have had on jury deliberations. Attempting to determine this would involve pure speculation.

To be sure, we could review the trial transcript, weigh the relative credibility of witnesses ourselves, and make an independent assessment of Curbelo's guilt. However, the Supreme Court has repeatedly instructed that such determinations are exclusively reserved in our system of justice for the jury, and are *not* to be undertaken by an appellate court. *See Sullivan*, 508 U.S. at 281 ("[Where a] reviewing court can only engage in pure speculation — its view of what a reasonable jury would have done . . . , 'the wrong entity judge[s] the defendant guilty.'" (second alteration in original) (quoting *Rose v. Clark*, 478 U.S. 570, 578 (1986)); *Bollenbach v. United States*, 326 U.S. 607, 615 (1946) ("In view of the place of importance that trial by jury has in our Bill of Rights, it is not to be supposed that Congress [in enacting the harmless error statute] intended to substitute the belief of appellate judges in the guilt of an accused, however . . . justifiably engendered by the dead record, for ascertainment of guilt by a

---

[7]The jury error in this case is easily distinguishable from the error in *United States v. Olano*, 507 U.S. 725 (1993), which the Court held should be evaluated for its prejudicial impact. *See id.* at 739-40 (applying harmless error analysis where alternate jurors had improperly been allowed in jury room); *see also United States v. Myers*, 280 F.3d 407, 412 (4th Cir.) (requiring defendant to demonstrate prejudice for violation of Rule 24(c) to be reversible), *cert. denied*, 123 S. Ct. 53 (2002). In *Olano*, the trial court erroneously permitted alternate jurors to be present during jury deliberations. In such circumstances, it would be possible to ascertain whether a defendant was prejudiced by the error. In this case, by contrast, we can never know if the improperly-dismissed juror would have voted to acquit.

jury under appropriate judicial guidance, however cumbersome that process may be.").

The Court has recognized that when an error "involves a violation of a statutory provision that 'embodies a strong policy concerning the proper administration of judicial business,'" courts may vacate the judgment without assessing prejudice. *Nguyen v. United States*, 123 S. Ct. 2130, 2138 (2003) (quoting *Glidden Co. v. Zdanok*, 370 U.S. 530, 536 (1962) (plurality decision)). Thus, while there is a "strong presumption that" when counseled defendants have had their case resolved by an impartial adjudicator, "other errors that may have occurred are subject to harmless-error analysis," *Rose*, 478 U.S. at 579, the adjudicators themselves must be *properly authorized and constituted*. When they are not, even if impartiality is not at issue, the judgment must be vacated. *See id.* (observing that harmless error review does not apply where "the wrong entity judged the defendant guilty"); *see also Nguyen*, 123 S. Ct. at 2138; *Gomez v. United States*, 490 U.S. 858, 876 (1989); *United States v. American-Foreign S.S. Corp.*, 363 U.S. 685, 691 (1960).

In *Nguyen*, for example, the Court vacated a decision by the Ninth Circuit that had been rendered by a panel consisting of two Article III judges and the Chief Judge of an Article IV territorial court. 123 S. Ct. at 2132-34. The Court held that Congress had not authorized Article IV judges to serve on the courts of appeals, and that the Chief Judge of the District for Northern Mariana Islands should not have been permitted to serve on the Ninth Circuit panel. *Id.* at 2135. Though urged by the Government to assess the prejudicial impact of the error, the Court explicitly declined to do so, noting that when an "error . . . involves a violation of a statutory provision that 'embodies a strong policy concerning the proper administration of judicial business,'" *id.* at 2137-38 (quoting *Glidden*, 370 U.S. at 536), courts need not "assess trial errors for their prejudicial effect." *Id.* at 2137.

In *Gomez*, the Court also declined to apply a harmless-error analysis to a violation of congressional policy regarding the proper adjudicator in federal court. 490 U.S. at 876. There, the district court had, without the defendant's consent, allowed a magistrate judge to preside over jury selection in a felony criminal trial. *Id.* at 860-61. The Court decided that the Federal Magistrates Act did not authorize such a del-

egation. Importantly for our purposes here, the "defendants made no special claim of prejudice. They contended . . . that the Magistrate had no power to conduct the *voir dire* examination and jury selection." *Id.* at 861. Although the Government urged the Court to apply harmless error review, the Court refused, observing that "[a]mong those basic fair trial rights that 'can never be treated as harmless' is . . . a defendant's right to have all critical stages of a criminal trial conducted by a person with jurisdiction to preside." *Id.* at 876 (quoting *Chapman*, 386 U.S. at 23).

Similarly, in *American-Foreign*, the Court refused to review for prejudice a decision rendered by an improperly constituted en banc court. 363 U.S. at 691. In that case, a retired circuit judge had participated in an en banc decision of a circuit court. The Supreme Court held that the relevant federal statute did not authorize retired judges to participate in such a proceeding. *Id.* at 686, 691. Thus, the Court held that "under existing legislation a retired circuit judge is without power to participate in an en banc Court of Appeals determination, and accordingly that the judgment must be set aside." *Id.* at 691. Despite the Government's argument that the error was harmless, *see* Brief for Respondents in *American-Foreign* at 37-47, the Court declined to consider "the merits of the underlying litigation" in determining whether the judgment should be vacated. *American-Foreign*, 363 U.S. at 691.

Just as the judgments rendered in those cases required vacatur without regard to prejudice because the adjudicators lacked congressional authorization, the judgment by the eleven-person jury in this case must be set aside. Rule 23(b) has deep historical and constitutional roots and indisputably represents a "strong policy," *Nguyen*, 123 S. Ct. at 2138, of ensuring criminal defendants in federal court the right to a twelve-person jury. Moreover, under the clear provisions of the Rule, the district court was "without power," *American-Foreign*, 363 U.S. at 691, to dismiss one of the jurors prior to deliberation, absent Curbelo's consent. Consequently, the district court's action depriving Curbelo of his right to a twelve-person jury requires us to vacate his convictions, without inquiry into specific prejudice caused by the error. *See United States v. Hanno*, 21 F.3d 42, 48 (4th Cir. 1994) (holding that, without regard to evidence of defendant's guilt, district court's improper dismissal of jurors was prejudicial).

Not surprisingly, all of our sister circuits, in considering violations of Rule 23(b), have agreed that such violations require *per se* reversal and are not subject to harmless error review.[8] For example, in *United States v. Essex*, 734 F.2d 832 (D.C. Cir. 1984), the Court of Appeals for the District of Columbia vacated a defendant's conviction because a trial court excused a juror after deliberations had begun without conducting a specific inquiry into whether dismissal was "necessary" and for "just cause," as required by Rule 23(b). *Id.* at 834, 842. Eschewing harmless error review, the court of appeals awarded Essex a new trial, explaining that she had been denied "[t]he obvious and substantial right . . . to a *unanimous* verdict by the *jury of 12* who heard her case and began their deliberations." *Id.* at 844 (emphases in original).

In doing so, the *Essex* court specifically held that the harmless error analysis does *not* apply to violations of Rule 23(b). *Id.* at 845. The court carefully analyzed and explained the reasons for excepting a Rule 23(b) error from harmless error review:

> In cases involving secret jury deliberations it is virtually impossible for a defendant to demonstrate actual prejudice. Courts therefore have determined that the potential for serious harm and the interest of the defendant — and the public — in fair, unbiased and secret deliberations are so great that no evidentiary showing of actual prejudice, or of defense

---

[8]The only court to have suggested that a harmless error analysis might apply is the Eighth Circuit, in *United States v. Roby*, 592 F.2d 406, 408 (8th Cir. 1979) (per curiam). In *Roby*, however, the Eighth Circuit addressed a situation where the violation of Rule 23(b) was a technical one: the defendant's consent had been obtained orally, rather than in writing. *Id.* In similar circumstances, most courts, including ours, refuse to find a Rule 23(b) error, reasoning that a defendant has either waived the writing requirement or invited the error. *See, e.g.*, *Fisher*, 912 F.2d at 731-33 (finding that defendant had waived Rule 23(b)'s written stipulation requirement by orally consenting to eleven-person jury); *see also, e.g.*, *United States v. Mahler*, 141 F.3d 811, 814-15 (8th Cir. 1998) (applying invited error doctrine in similar circumstances). The writing requirement of Rule 23(b) is a technical aspect of the Rule, and oral consent will, in most cases, satisfy the Rule's stipulation requirement. The Eighth Circuit's per curiam decision in *Roby* stands for nothing more.

> counsel's objection to the internal functioning of the jury of which he could not possibly be informed, is required.

*Id.* The D.C. Circuit reaffirmed this holding in *United States v. Patterson*, 26 F.3d 1127 (D.C. Cir. 1994). There, as in *Essex*, the trial court had excused a juror without making the requisite finding "that it is 'necessary' to excuse the juror for 'just cause.'" *Id.* at 1129. Relying on *Essex*, the court held that such an error is *per se* reversible, without regard to whether the error prejudiced the defendant. *Id.*

Similarly, in *United States v. Taylor*, 498 F.2d 390 (6th Cir. 1974) (per curiam), the Sixth Circuit rejected the proposition that harmless error review applies to a violation of Rule 23(b). *Id.* at 392. In *Taylor*, the trial court had obtained an oral stipulation from defendant's counsel to proceed with eleven jurors if a juror became ill. *Id.* at 391. The Sixth Circuit had previously held that an oral stipulation satisfied the stipulation requirement of Rule 23(b). *See United States v. Lane*, 479 F.2d 1134 (6th Cir. 1973) (per curiam). The *Taylor* court, however, found error in the trial court's failure to question the defendant directly on whether he consented to proceeding with eleven jurors. *Taylor*, 498 F.2d at 391. Thus, the "sole question" presented on appeal was "whether the failure of the District Court to comply literally with the terms of Rule 23 requires reversal for new trial." *Id.* at 392. Addressing this issue, the Sixth Circuit stated: "[w]e note that the government's primary insistence on this appeal is that the error complained of was harmless. We cannot so construe it. To do so would be to open the door to emasculation of the rule." *Id.*

By the same token, the Seventh Circuit in *United States v. Araujo*, 62 F.3d 930 (7th Cir. 1995), recently decided that a violation of Rule 23(b) entitles a defendant to a new trial, without regard to whether the error was actually prejudicial. *Id.* at 937. In *Araujo*, the court noted that two distinct questions are presented by a trial court's decision to excuse a juror: "first, whether the court had just cause to excuse the twelfth juror, and second, whether the district court was correct in allowing the bobtailed jury to continue rather than declaring a mistrial." *Id.* at 933. The trial court had dismissed a juror who had "problems with his automobile," *id.* at 932, and "was stranded on the side of the road." *Id.* (internal quotation marks omitted). The Seventh Circuit determined that these bases for dismissal failed to satisfy the "just

cause" requirement of Rule 23(b), and it reversed Araujo's convictions without reaching the second question. *Id.* at 934-37. Importantly, and particularly relevant here, the court awarded relief on the Rule 23(b) error without considering whether Araujo suffered actual prejudice. *Id.* at 937.

Finally, the Ninth Circuit has also decided that a violation of Rule 23(b) entitles a defendant to a new trial — without regard to a showing of actual prejudice. In *United States v. Tabacca*, 924 F.2d 906 (9th Cir. 1991), the court concluded that Rule 23(b) was violated when a juror was excused because his wife had taken his car keys. *Id.* at 913. Finding these facts insufficient to provide "just cause" to dismiss the juror, the court awarded Tabacca a new trial. *Id.* at 915. Likewise, in *United States v. Guerrero-Peralta*, 446 F.2d 876 (9th Cir. 1971), the Ninth Circuit premised its reversal of a defendant's convictions on a Rule 23(b) violation. In that situation, defense counsel had orally represented to the trial court that the defendant agreed to proceed with eleven jurors. *Id.* at 877. The court found that the oral representation failed to satisfy Rule 23(b)'s mandate,[9] and it reversed without considering harmlessness. *Id.*; *see also United States v. Reyes*, 603 F.2d 69, 71-72 (9th Cir. 1979) (declining to apply harmless error standard to violation of Rule 23(b)'s written stipulation requirement).[10]

In light of the fundamental importance of the jury in our criminal

---

[9]Rule 23(b) requires a defendant's stipulation to be in writing. *See* Fed. R. Crim. P. 23(b)(2) (2002).

[10]Our sister circuits have also held that violations of other Federal Rules of Criminal Procedure are *per se* reversible. *See, e.g.*, *Green v. United States*, 262 F.3d 715, 717-18 (8th Cir. 2001) (holding violation of Rule 8(c) of Rules Governing § 2255 Proceedings, which guarantees right to counsel on habeas, required reversal without regard to prejudice); *United States v. Fawley*, 137 F.3d 458, 470-71 (7th Cir. 1998) (holding jury instruction that violated Rule 31(a) was reversible error without consideration of prejudice); *United States v. F. J. Vollmer & Co., Inc.*, 1 F.3d 1511, 1522 (7th Cir. 1993) (holding that "[t]he right to poll a jury is a substantial right" guaranteed by Rule 31(d) and that "[f]ailure to poll a jury upon a timely request is per se error requiring reversal" (internal quotation marks omitted)).

justice system, Curbelo's right to due process, and the express provision in the Federal Rules of Criminal Procedure governing the dismissal of a juror, we must follow our sister circuits and conclude that the court's decision to excuse the twelfth juror prior to deliberations and absent the defendant's consent falls into the special category of errors that "defy analysis by harmless-error standards" and require automatic reversal because they are "necessarily unquantifiable and indeterminate." *Sullivan*, 508 U.S. at 281-82 (internal quotation marks and citation omitted); *see United States v. Neal*, 101 F.3d 993, 999 (4th Cir. 1996) ("Errors that are not susceptible to harmless error review . . . necessarily affect substantial rights." (internal quotation marks and citation omitted)).

The Rule 23(b) error in Curbelo's trial tainted the process by which guilt was determined, and it therefore inherently casts doubt on the reliability of the jury's verdict. It is this sort of error — like others that have been deemed ill-suited to the harmless error inquiry, *see, e.g.*, *Nguyen*, 123 S. Ct. at 2138; *Martinez-Salazar*, 528 U.S. at 316; *Sullivan*, 508 U.S. at 281-82; *United States v. David*, 83 F.3d 638, 647 (4th Cir. 1996) — that is inherently prejudicial and *per se* reversible. As the D.C. Circuit explained in *Essex*, in assessing a similar Rule 23(b) violation, "where, as here, the prejudice is inherent in the error complained of, the defendant is not required to prove that he is innocent, or that the outcome of the trial would have been different." 734 F.2d at 845. Accordingly, "even defendants who are obviously guilty are entitled to the basic procedural safeguards of a fair trial," including those required by Rule 23(b). *Id.*[11]

---

[11]The dissent's effort to distinguish *Essex* and the other Rule 23(b) decisions of our sister circuits misses the mark. The dissent maintains that in those cases "the district court failed to establish sufficient 'just cause' for excusing a juror," while in this case Curbelo does not assert a failure to establish "just cause." *Post* at 29. Even if just cause is established, however, Rule 23(b) permits a trial court to excuse a juror only "after the jury has retired to consider its verdict." Fed. R. Crim. P. 23(b). In the Rule 23(b) decisions of our sister circuits, the district courts at least acted at the juncture permitted by the Rule — after jury deliberations had commenced. Here the district court decided to proceed with eleven jurors *in the midst of trial*, well prior to jury deliberations. Nothing in the Rule permits such a procedure, no matter how "just" the cause.

IV.

Even if we were to conclude that the district court's violation of Rule 23(b) — in improperly dismissing one of the jurors from Curbelo's trial — did not constitute structural error and therefore was subject to harmless error review, we would nonetheless be forced to vacate Curbelo's conviction. This is so because the Government has failed to meet its burden of demonstrating that the error was harmless, even if we assume the error is not of constitutional dimension and we thus apply the harmless error standard announced by the Court in *Kotteakos*.

If the defendant fails to raise an objection to an error at trial, we review the error under the plain error standard of Rule 52(b). Under that rule, *the defendant* bears the burden of demonstrating that a plain error affected his substantial rights, and even if he meets this burden, an appellate court has discretion to ignore the error and should do so unless it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Olano*, 507 U.S. at 732 (internal quotation marks omitted and alteration in original). In contrast, if a defendant preserves his objection to an error, an appellate court reviews the error under the harmless error standard of Rule 52(a) — a standard significantly more favorable to the defendant. Under Rule 52(a), *the Government* bears the burden of demonstrating that the error did not affect the defendant's substantial rights. If the Government fails to meet that burden, an appellate court must reverse; it has no discretion to ignore the error. *Id.* at 734-35. The Government concedes that Curbelo preserved his objection to the error here and that (if the error were not structural) our review is under the more-favorable-to-the-defendant standard of Rule 52(a), with the Government bearing the burden of proving the error did not affect Curbelo's substantial rights.

In its landmark decision in *Kotteakos*, the Supreme Court explained that when reviewing a nonconstitutional error under Rule 52(a), an appellate court must determine if the Government has proved "with fair assurance . . . that the judgment was not substantially swayed by the error." 328 U.S. at 765. Moreover, in determining if the Government has met this burden, a court must not "strip[ ] the erroneous action from the whole." *Id.* Thus,

[t]he inquiry cannot be merely whether there was enough [evidence] to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

*Id.* The Court later explained that "grave doubt" meant "that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995).

The Government maintains that the conceded Rule 23(b) error here was harmless, but its entire argument as to harmlessness is as follows:

There is no reason to believe that the verdict of a twelve-member jury would have been any different than the verdict of the eleven-member jury. Evidence of Defendant's involvement in the drug conspiracy and evidence of Defendant's participation in a series of drug deals was quite simply overwhelming. Because Defendant's substantial rights were not impaired, the verdict should be affirmed.

Brief of Appellee at 7. The Government does not in any way detail the assertedly "simply overwhelming" evidence.

This is, perhaps, for good reason. Although our careful review of the record indicates that the Government presented substantial evidence against Curbelo, the Government's case was not "simply overwhelming." Indeed, we cannot say with any assurance, let alone "fair assurance" that the absence of a twelfth juror did "not substantially sway[ ]" the judgment. *Kotteakos*, 328 U.S. at 765. Accordingly, we cannot conclude that the Government has met its burden of demonstrating that the jury's decision was unaffected by the absence of the twelfth juror.

As an initial matter, we note that the Government charged Curbelo with twelve crimes and that the eleven-person jury acquitted him of five of them. The same witnesses testified as to all of the counts, *i.e.*, both those on which the jury acquitted, as well as those on which it

convicted. This certainly indicates that a reasonable twelfth juror could have found the Government's evidence lacking (as the remaining eleven did for some counts).

Indeed, the district court itself found Williams, the principal Government witness, less than truthful; surely, a reasonable juror could have as well. A juror could have concluded that Williams lied not only about his role in Wendy's kidnaping and the robbery but also about his drug deals with Curbelo. Certainly when Williams became the target of a federal investigation, he had every reason to lie about his dealings with Curbelo.

Furthermore, Williams himself admitted that there was "no physical evidence of any of th[e] transactions" in which he purportedly engaged with Curbelo. Law enforcement officers also acknowledged this and the limitations of the tapes that purportedly recorded the transactions. Except for the agents, who could only testify about what Williams and others told them and what the arguably-inconclusive tapes revealed, all of the witnesses against Curbelo were co-conspirators or drug dealers. Many of them had cooperation agreements with the Government, and hence, a motive to lie.

Perhaps most significantly, a juror could conclude that Jose, rather than Curbelo, had sold drugs to Williams. After all, Curbelo rarely spoke directly to Williams. Indeed, for many of the transactions, Williams spoke *only* to Jose, gave money *only* to Jose, and took drugs *only* from Jose. Thus, the jury was provided with a possible answer to the critical question that arises in almost every criminal case: If the defendant did not commit the crime, who did? It is undisputed that Curbelo had little grasp of English. This gives some credence to Curbelo's testimony that, because of the language barrier, he had no idea that Williams and Jose were dealing drugs.

Finally, Curbelo took the stand in his own defense and maintained his innocence with detailed explanations of his non-drug-related relationships with the various witnesses. In light of the questionable credibility of many Government witnesses, the concessions of the law enforcement officers who testified for the prosecution, Curbelo's own testimony, and the problems with the audio and video tapes, a twelfth juror might easily have been left with reasonable doubt as to Cur-

belo's guilt. Further, a twelfth juror might, during the course of jury deliberations, have been able to raise persuasive points in Curbelo's defense; the juror may even have held out for acquittal on all counts. Just as we recognized in *Myers*, 280 F.3d at 412, that the presence of an *additional* juror made a guilty verdict *less likely*, we must acknowledge in this case that the *absence* of a juror made a guilty verdict *more likely*.

For all of these reasons, even if the Rule 23(b) error were not structural, we would nonetheless conclude that Curbelo is entitled to a new trial because the Government has failed to meet its burden to demonstrate that the error was harmless. To be sure, the Government offered "enough to support the result," but we have no "fair assurance . . . that the judgment was not substantially swayed by the error." *Kotteakos*, 328 U.S. at 765. Thus even if the error were subject to harmless error review, we could not conclude that it was sufficiently harmless to justify affirming Curbelo's convictions.

## V.

For the foregoing reasons, we vacate Curbelo's convictions and remand for a new trial.

*VACATED AND REMANDED*

WILKINS, Chief Judge, dissenting:

The majority concludes that the decision by the district court to proceed with 11 jurors without Curbelo's consent is a structural error that mandates reversal without any inquiry into whether the error actually prejudiced Curbelo. Alternatively, the majority concludes that the error was not harmless because the evidence was sufficiently close that the absence of a twelfth juror may have affected the verdict. Because I disagree with both of these conclusions, I respectfully dissent.

## I.

Most errors that are preserved at trial—including most constitutional errors—must be reviewed for harmlessness. *See* Fed. R. Crim.

P. 52(a) (providing that "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded"); *Neder v. United States*, 527 U.S. 1, 7 (1999). The Supreme Court, however, has "recognized a limited class of fundamental constitutional errors that defy analysis by harmless error standards." *Neder*, 527 U.S. at 7 (internal quotation marks omitted). "Errors of this type are so intrinsically harmful as to require automatic reversal (*i.e.*, 'affect substantial rights') without regard to their effect on the outcome." *Id.* Such errors include the complete deprivation of counsel, a biased trial judge, racial discrimination in the selection of a grand jury, or a defective reasonable doubt instruction. *See id.* at 8 (collecting cases). These errors are always reversible because they "deprive defendants of basic protections without which a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence and no criminal punishment may be regarded as fundamentally fair." *Id.* at 8-9 (internal quotation marks and alteration omitted).

The majority's determination that the error here is structural—and thus not subject to harmless error review—is incorrect for two reasons. First, this error cannot be structural because it is not of constitutional magnitude. Second, even if the error were of constitutional dimension, it would not qualify as a structural error because it did not render the trial inherently unreliable or unfair.

## A.

The Supreme Court and this court have repeatedly made clear that structural errors necessarily must affect a defendant's constitutional rights. *See, e.g., Neder*, 527 U.S. at 7 ("Although [the harmless error rule] by its terms applies to *all* errors where a proper objection is made at trial, we have recognized a limited class of *fundamental constitutional errors* that defy analysis by harmless error standards." (second emphasis added) (internal quotation marks omitted)); *Rose v. Clark*, 478 U.S. 570, 577 (1986) ("[T]he Court in *Chapman* recognized that some *constitutional errors* require reversal without regard to the evidence in the particular case." (emphasis added)); *Arnold v. Evatt*, 113 F.3d 1352, 1360 (4th Cir. 1997) ("In examining the effect of *constitutional errors* on criminal convictions, the Supreme Court has established a distinction between structural errors, which require automatic reversal, and all other errors, which are subject to harmless-

error analysis." (emphasis added)). As other circuits have recognized, "[t]here is no separate category of structural error apart from constitutional error. The only question is whether any constitutional errors . . . rise to the level of structural error." *United States v. Sanchez*, 269 F.3d 1250, 1272 n.41 (11th Cir. 2001) (en banc), *cert. denied*, 535 U.S. 942 (2002); *see also Ross v. United States*, 289 F.3d 677, 681 (11th Cir. 2002) (per curiam) ("Structural error, to which harmless error analysis does not apply, occurs only with extreme deprivations of *constitutional rights* . . . ." (emphasis added) (internal quotation marks omitted)), *cert. denied*, 537 U.S. 1113 (2003); *Bentley v. Scully*, 41 F.3d 818, 823 n.1 (2d Cir. 1994) ("A 'structural error' requires automatic reversal and is not subject to harmless error analysis because it involves a deprivation of a [basic] *constitutional protection* . . . ." (emphasis added)); *United States v. Pavelko*, 992 F.2d 32, 35 (3d Cir. 1993) ("'Structural defects' deprive the criminal trial of *constitutional protections* . . . ." (emphasis added)).

Yet the error that the majority classifies as structural—the decision by the district court to proceed with 11 jurors absent Curbelo's consent—does not implicate Curbelo's constitutional rights. In *Williams v. Florida*, 399 U.S. 78 (1970), the Supreme Court held that criminal defendants have no Sixth Amendment right to a 12-person jury. *See Williams*, 399 U.S. at 98-103. The majority suggests that the holding of *Williams* may be limited to state court prosecutions and that there may be a due process right to a 12-member jury. However, in another case involving Federal Rule of Criminal Procedure 23(b), we relied on *Williams* in recognizing that a defendant's "constitutional right to [a] jury trial . . . does not include the right to a jury of twelve." *United States v. Fisher*, 912 F.2d 728, 733 (4th Cir. 1990) (citing *Williams*, 399 U.S. at 98-103). And, other circuits have interpreted *Williams* as establishing that criminal defendants have no constitutional right to 12 jurors. *See, e.g., United States v. Barone*, 114 F.3d 1284, 1308 n.21 (1st Cir. 1997) ("The Supreme Court has made clear that the Constitution does not require twelve jurors for conviction. We have stated that *Williams* effectively answers the claim that 11 jurors are too few . . . ." (citation and internal quotation marks omitted)); *United States v. Smith*, 789 F.2d 196, 205 (3d Cir. 1986) ("It is clear to us that twelve jurors are not [constitutionally] required for a conviction."); *United States v. Stratton*, 779 F.2d 820, 831 (2d

Cir. 1985) ("[T]he Supreme Court has . . . made clear that the Constitution does not require twelve jurors for conviction.").

The Supreme Court decisions cited by the majority do not support the proposition that "structural errors need not be of constitutional dimension." *Ante*, at 10 n.6. Most of those cases involve *jurisdictional* errors, *not* structural ones. *See, e.g., Nguyen v. United States*, 123 S. Ct. 2130, 2132 (2003) (vacating judgments of court of appeals because panel consisting of two Article III judges and one Article IV judge did not "ha[ve] the authority to decide petitioners' appeals"). In contrast to structural errors, which involve inherent prejudice to a particular defendant, *see Neder*, 527 U.S. at 7-9, the cases cited by the majority deal with errors primarily affecting the structure and function of the judicial system. *See Nguyen*, 123 S. Ct. at 2137 ("[O]ur enforcement of [the designation statute's] outer bounds is not driven so much by concern for the validity of petitioners' convictions at trial but for the validity of the composition of the Court of Appeals."); *id.* ("Even if the parties had expressly stipulated to the participation of a non-Article III judge in the consideration of their appeals . . . such a stipulation would not have cured the plain defect in the composition of the panel." (emphasis omitted)); *United States v. American-Foreign S.S. Corp.*, 363 U.S. 685, 691 (1960) (vacating en banc court of appeals decision because retired circuit judge was "without power to participate" in that decision, and "intimat[ing] no view as to the merits of the underlying litigation").[1] In each of these cases, the

---

[1]One of the decisions cited by the majority includes language describing the jurisdictional error in terms of prejudice to the defendant. *See Gomez v. United States*, 490 U.S. 858, 876 (1989) (referring to a defendant's "basic . . . right to have all critical stages of a criminal trial conducted by a person with jurisdiction to preside"). But to the extent that *Gomez* construes a magistrate judge's involvement in jury selection in a felony trial without the defendant's consent as a structural error, that error is based on a violation of the defendant's *constitutional* right to have an Article III judge preside over critical stages of trial. *See Peretz v. United States*, 501 U.S. 923, 929-30 (1991); *United States v. Arnoldt*, 947 F.2d 1120, 1123 (4th Cir. 1991). Thus, *Gomez* does not support the majority's assertion that structural errors need not be constitutional in nature. And, as explained above, a defendant has no constitutional right to conviction by 12 jurors.

Supreme Court invalidated judicial proceedings involving judges who lacked the power to participate in those proceedings. These decisions are inapplicable to this case involving a violation of a procedural rule during trial by a district judge who unquestionably had jurisdiction to preside over the case. Indeed, I have found no decision—and the majority has cited none—applying these holdings to trial errors involving the composition of juries.

The majority claims that the error here, like the error in *Nguyen*, "involves a violation of a statutory provision that 'embodies a strong policy concerning the proper administration of judicial business'" and therefore should not be reviewed for harmlessness. *Nguyen*, 123 S. Ct. at 2137-38 (quoting *Glidden Co. v. Zdanok*, 370 U.S. 530, 536 (1962) (plurality opinion)). But again, both *Nguyen* and *Glidden* involved jurisdictional issues concerning whether particular judges were empowered to preside over certain proceedings. Thus, it is clear that the language regarding "administration of judicial business," as used by the Supreme Court, applies only to errors that primarily affect the court system. *See American-Foreign S.S. Corp.*, 363 U.S. at 687 (describing issue regarding power of retired circuit judge to participate in en banc decision as "a question of importance to the Court of Appeals in the administration of their judicial business").

### B.

Even if the error here were of constitutional magnitude, it would not amount to structural error. The Supreme Court has recognized that

---

The majority also cites *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787 (1987). In *Young*, however, only four of the nine justices concluded that the appointment of an interested private attorney to prosecute a criminal contempt action is *per se* reversible error because of the inherent conflict of interest. *See id.* at 809-14 (Opinion of Brennan, J.). Three other justices concluded that the error should be reviewed for harmlessness. *See id.* at 826-27 (Powell, J., concurring in part and dissenting in part). In any event, the error in *Young*—like the errors in the other cases cited by the majority, and unlike the error here—affected the proper functioning of the judicial system. Indeed, a majority of the Court in *Young* agreed that the exercise of the Court's supervisory authority was appropriate because the case involved "the determination of the procedures to be employed by courts to enforce their orders, a subject that directly concerns the functioning of the Judiciary." *Id.* at 809.

"most constitutional errors can be harmless." *Neder*, 527 U.S. at 8 (internal quotation marks omitted). "If the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other constitutional errors that may have occurred are subject to harmless-error analysis." *Id.* (internal quotation marks and alterations omitted). As explained above, the Supreme Court has "found an error to be structural, and thus subject to automatic reversal, only in a very limited class of cases," such as those involving the complete deprivation of counsel, a biased trial judge, racial discrimination in the selection of a grand jury, or a defective reasonable doubt instruction. *Id.* (internal quotation marks omitted). These errors require reversal without any specific showing of prejudice to the defendant because they "*necessarily* render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." *Id.* at 9.

But unlike the errors listed above—which, by their very nature, create a powerful presumption that the defendant was prejudiced—an error by a district court in proceeding with 11 jurors absent a defendant's consent does not automatically render the trial unreliable or unfair. Rule 23(b) allows the parties to stipulate at the outset of trial that the jury will consist of fewer than 12 members. The parties may also stipulate to proceeding with fewer than 12 jurors in the event the court finds it necessary to excuse one or more jurors after trial commences. *See* Fed. R. Crim. P. 23(b) (amended Dec. 1, 2002). Further, the court may proceed with 11 jurors—even without the parties' consent—if the court finds it necessary to excuse a juror after deliberations have begun. *See id.* Thus, Rule 23 contemplates that verdicts will sometimes be rendered, as here, by 11 rather than 12 jurors.

It is undisputed that the decision by the district court to proceed with 11 jurors violated the terms of Rule 23(b) because Curbelo declined to consent to an 11-person jury and deliberations had not yet begun. But the majority fails to explain how these circumstances alone make the verdict rendered by 11 jurors inherently unreliable or unfair. Indeed, the Supreme Court has specifically rejected the notion that a jury with fewer than 12 members is less reliable or less fair to defendants. *See Williams*, 399 U.S. at 100-02.

The majority does not address the reliability and fairness concerns that the Supreme Court has made clear are at the heart of structural

error analysis. Instead, my colleagues emphasize that the error here affected the entire trial and therefore its prejudicial effect cannot be quantified. But this approach overlooks the critical point that the error of proceeding with trial before 11 jurors without the defendant's consent "does not *necessarily* render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." *Neder*, 527 U.S. at 9. Indeed, under the majority's analysis, any error that arguably had some connection to the trial as a whole—regardless of whether it affected the reliability or fairness of the trial—might be deemed structural. *Cf. United States v. Lane*, 474 U.S. 438, 446-49 (1986) (holding that misjoinder of defendants for trial, in violation of Federal Rule of Criminal Procedure 8(b), is reviewable for harmlessness, and rejecting argument that such an error is *per se* prejudicial).

And, while the majority claims that the error here is not sufficiently quantifiable to be analyzed for harmlessness, other courts have reviewed similar errors to determine their prejudicial impact on the defendant. *See United States v. Ahmad*, 974 F.2d 1163, 1165-66 (9th Cir. 1992) (holding that any error in conducting Rule 23(b) conference in defendant's absence was not plain error, in part because "given the strength of the evidence against [the defendant], and the swiftness with which the jury returned its verdict, there is no reason to believe that the verdict would have been different if either [the excused juror] had been on the jury, or a different jury had heard the case"); *United States v. Roby*, 592 F.2d 406, 408 (8th Cir. 1979) (per curiam) (holding that any violation of Rule 23(b) in failing to obtain written stipulation to use of 11-member jury was harmless because evidence against defendant was "very strong").[2] Indeed, the Supreme Court has made clear that even the complete omission of an element of a crime from the jury charge may be reviewed for harmlessness. *See Neder*, 527 U.S. at 10. In such a case, harmless error review is

---

[2]While the majority suggests that *Roby* dealt with a purely technical violation of Rule 23(b), the Eighth Circuit apparently assumed for purposes of decision that the lack of a written stipulation rendered invalid the defendant's consent to proceed with 11 jurors. *See Roby*, 592 F.2d at 408. Nonetheless, the Eighth Circuit examined the record and determined that any such error was harmless because "[t]he evidence . . . was very strong" and "[t]here was no evidence to sustain appellant's claim that she was being framed." *Id.*

permitted even though the jury was never required to weigh the evidence on the omitted element and therefore *no juror* found all the elements necessary for conviction. *See id.* Here, however, *11 jurors* received proper instructions on the offense elements, weighed all of the evidence, and unanimously found Curbelo guilty.

Also, the cases that the majority cites for the proposition that violations of Rule 23(b) are *per se* reversible error are inapplicable here. In nearly all of these cases, the district court failed to establish sufficient "just cause" for excusing a juror before proceeding with an 11-member jury, as required by Rule 23(b). The appellate decisions overturning the verdicts in these cases reflect the importance of preventing jurors—particularly those who might have "dissenting views"—from simply "opt[ing] out at will." *United States v. Essex*, 734 F.2d 832, 841 (D.C. Cir. 1984). Here, however, Curbelo does not assert that the reason articulated by the district court for excusing the juror—that she was "suffering from irritable bowel syndrome and [was] totally unable to function," J.A. 143—was insufficient to establish "just cause" for her excusal, or that the juror may have "opted out" because of her views on the merits of the case.[3] *Cf. United States v. Wilson*, 894 F.2d 1245, 1250-51 (11th Cir. 1990) (distinguishing *Essex* on the ground that district court in case at bar had established just cause for excusing juror during deliberations, and noting that "the record does not present even the slightest basis to believe that this juror was a holdout juror or that the jury had reached any sort of impasse in its deliberations").

In sum, because the majority's approach to structural error analysis

---

[3]The majority notes that "[o]ur sister circuits have also held that violations of other Federal Rules of Criminal Procedure are *per se* reversible." *Ante*, at 17 n.10. The Supreme Court, however, has rejected the notion that violations of the Rules of Criminal Procedure can never be reviewed for harmlessness. *See Lane*, 474 U.S. at 446 n.9 ("It is difficult to see any logic in the argument that although the harmless-error rule may be applicable to *constitutional* violations, it should not be applied to violations of mere procedural rules."); *see also id.* at 448 n.11 (rejecting "a rule-by-rule review establishing bright-line *per se* rules whether to conduct harmless-error analysis" and explaining that "on its face, Rule 52(a) admits of no broad exceptions to its applicability").

vitiates the strong presumption in favor of harmless error review, I must dissent from the holding that the error here is structural. *See Neder*, 527 U.S. at 18 ("Reversal for error, regardless of its effect on the judgment, encourages litigants to abuse the judicial process and bestirs the public to ridicule it." (internal quotation marks omitted)); *see also Sherman v. Smith*, 89 F.3d 1134, 1138 (4th Cir. 1996) (en banc) (emphasizing that "judges should be wary of prescribing new errors requiring automatic reversal" and that "before a court adds a new error to the list of structural errors (and thereby requires the reversal of *every* criminal conviction in which the error occurs), the court must be certain that the error's presence would render *every* such trial unfair").

## II.

Having concluded that the error by the district court in proceeding with 11 jurors was not structural, I would further hold that this error was harmless. The narcotics trafficking evidence against Curbelo was "quite simply overwhelming." Br. of Appellee at 7. Though the majority highlights what it perceives as weaknesses in the Government's evidence, the overall case against Curbelo on the narcotics charges was extremely strong. This evidence included a number of tape-recorded conversations among Curbelo and his associates discussing narcotics transactions; controlled purchases of narcotics from Curbelo's place of business; testimony from several individuals describing Curbelo's involvement in drug trafficking; warranted searches of Curbelo's real property and vehicle that yielded narcotics, paraphernalia, and incriminating documents; and testimony from an ATF agent describing an interview during which Curbelo—with his attorney present—confessed in detail to drug trafficking.

In response to this compelling evidence, Curbelo "den[ied] that [he] was ever involved in drug transactions," J.A. 403; asserted that all the Government's witnesses were "lying," *id.* at 381; and claimed that the surveillance tapes containing his voice had been "manipulated," "edited," and "tampered with," *id.* at 408, 410. Curbelo also testified that his conversations about narcotics were intended to create the illusion of a "pretend simulated drug business" in order to "set a trap" for Thurnell Williams, who Curbelo believed had previously robbed his store. *Id.* at 394-95. However, Curbelo claimed that he was

later surprised to learn that one of his main associates who was also part of these conversations was actually selling drugs to Williams. Curbelo also denied making some of the statements to the ATF agent and claimed that he had fabricated others to protect his girlfriend from prosecution.

In short, the Government presented a mountain of proof that Curbelo was guilty of narcotics trafficking. And, Curbelo's complete denial of guilt—relying on far-fetched explanations for the Government's evidence—does not create a reasonable doubt regarding whether the twelfth juror's absence affected the verdict. *See, e.g., United States v. Blevins*, 960 F.2d 1252, 1263-64 (4th Cir. 1992) (holding that despite defendants' testimony asserting their innocence, admission of improper evidence was harmless error in light of overwhelming evidence of defendants' guilt). Also, while the record is not entirely clear, it appears that the jury reached its verdict in a matter of hours. Under these circumstances, I can say with more than "fair assurance . . . that the judgment was not substantially swayed by the error" of proceeding with 11 jurors. *Kotteakos v. United States*, 328 U.S. 750, 765 (1946).[4]

---

[4]In asserting that a 12-member jury might have reached a different verdict on the narcotics charges, the majority notes that the 11-member jury acquitted Curbelo on the charges of possessing firearms in furtherance of drug trafficking. But this argument overlooks the fact that the evidence concerning the firearms charges was different from and much weaker than the evidence on the narcotics charges. If anything, the fact that the same 11-member jury that convicted Curbelo of all the narcotics charges also acquitted him of the firearms charges demonstrates the reliability of this jury in carefully weighing the evidence relating to each of the charges.

The majority also notes that the district court was skeptical of certain aspects of Williams' testimony. As explained above, however, the Government presented extensive evidence against Curbelo from sources other than Williams. Thus, even independent of Williams' testimony, the Government presented a compelling case establishing Curbelo's involvement in drug trafficking.

### III.

Despite the error by the district court in proceeding with 11 jurors, Curbelo received what the Constitution entitles him to: "a fair trial, not a perfect one." *Rose*, 478 U.S. at 579 (internal quotation marks omitted). "'[T]he commonsense judgment of a group of laymen . . . large enough to promote group deliberation, free from outside attempts at intimidation, and to provide a fair possibility for obtaining a representative cross-section of the community' was interposed between [Curbelo] and his government accusers." *Fisher*, 912 F.2d at 733 (quoting *Williams*, 399 U.S. at 100) (first and second alterations in original). And, Curbelo was convicted based on overwhelming evidence, with no indication that the absence of a twelfth juror had any effect on the verdict. I therefore dissent from the majority's decision to overturn the jury's verdict based on a nonconstitutional error that did not prejudice Curbelo. Because I believe that the other points raised by Curbelo are also meritless, I would affirm his convictions and sentences.