[Cite as *State v. Ortiz*, 2023-Ohio-2114.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## LAKE COUNTY

| | |
|---|---|
| STATE OF OHIO,<br><br>　　　　Plaintiff-Appellee,<br><br>- vs -<br><br>GERARDO ORTIZ, JR.,<br><br>　　　　Defendant-Appellant. | CASE NO. 2022-L-061<br><br><br>Criminal Appeal from the<br>Court of Common Pleas<br><br><br>Trial Court No. 2021 CR 001050 |

**O P I N I O N**

Decided: June 26, 2023
Judgment: Affirmed

*Charles E. Coulson*, Lake County Prosecutor, *Teri R. Daniel*, Assistant Prosecutor, and *Adam M. Downing*, Assistant Prosecutor, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Jay F. Crook*, Jay F. Crook, Attorney at Law, LLC, 30601 Euclid Avenue, Wickliffe, OH 44092 (For Defendant-Appellant).


JOHN J. EKLUND, P.J.

{¶1}　　Appellant, Gerardo Ortiz Jr., appeals his conviction for Aggravated Arson, a first-degree felony, in violation of R.C. 2909.02(A)(1), from the Lake County Court of Common Pleas. Appellant was in a relationship with Rebecca Nall and was convicted of Aggravated Arson for setting fire to her residence while she and others were present in the building. Appellant has raised two assignments of error arguing that the trial court erred when it allowed the State's expert witness to testify that a dresser was an accelerant

based on a picture of it. He also argues that the evidence against him was circumstantial, and his conviction was against the manifest weight of the evidence.

{¶2} After review of the record and the applicable caselaw, we find appellant's assignments of error are without merit. The trial court did not abuse its discretion in permitting the State's expert witnesses to testify that an accelerant can be "anything that makes a fire move faster" and that a dresser found at the origin of the basement fire looked like it was made of manmade, petroleum based materials and could have acted as an accelerant that caused the fire to spread more quickly. Next, appellant's conviction was not against the manifest weight of the evidence. Although there was no direct evidence appellant set the fire, an expert fire investigator determined the fire had two points of origin and was set by human hands. Appellant had previously burned several of Nall's items and had threatened to burn the house down. Further, appellant was at the house the morning of the fire, argued with Nall, and was seen on a security camera leaving the house approximately five minutes before visible smoke started coming from the residence.

{¶3} Therefore, we affirm the judgment of the Lake County Court of Common Pleas.

**Substantive and Procedural History**

{¶4} Rebecca Nall lived at 7488 Southwood Drive with housemates Angela Perfetti, Ricky Belvins, Angel Miler, and Phillip Jenkins. Appellant and Nall were in a relationship. On August 3, 2021, appellant and Nall argued. During the argument, appellant told Nall "You have no idea what I was about to do." Appellant left the house

and within minutes, the occupants and neighbors saw smoke coming from the basement. Nall exclaimed that appellant had set the house on fire. A fire investigator determined that there were two points of origin for the fire, the basement and the pantry.

{¶5} On February 21, 2021, appellant was indicted on one count of Aggravated Arson, a first-degree felony, in violation of R.C. 2909.02(A)(1), and one count of Arson, a second-degree felony, in violation of R.C. 2909.02(A)(2).

{¶6} On April 25, 2022, appellant's case proceeded to a jury trial. The State called 21 witnesses and presented the following evidence:

{¶7} Angel Miller testified that she stayed in the upstairs bedroom of 7488 Southwood. Miller said Nall used to stay in a basement bedroom, but that a flood made Nall move to a second floor bedroom. Miller identified a pre-fire picture of a pink colored Victoria's Secret armoire that belonged to Nall and had been in the basement bedroom.

{¶8} Appellant and Nall were dating and had a toxic relationship with frequent arguments, appellant set Nall's table on fire outside the house a few days before the house fire.

{¶9} Miller came home from work around 2:30 a.m. on August 3 and appellant was at the house. She said that before she fell asleep, she heard appellant and Nall arguing. Miller woke up around 9:00 a.m. when she heard Nall screaming "my house is on fire." She left her bedroom and could feel the heat from the fire; it was particularly hot near the stairs. She saw smoke rolling out of the basement. Miller retrieved her dog from her bedroom, but was unable to retrieve her pet lizard and left it behind because by the time she returned to her bedroom, it was filled with smoke and the room was hot. Other

3

than the lizard, the fire destroyed all of her personal belongings. Miller had a prior conviction in 2011 for trafficking in drugs.

{¶10} Ricky Blevins also resided at 7488 Southwood at the time of the fire. He lived there with his girlfriend Angela Perfetti. Blevins testified to the following: appellant had admitted to burning one of Nall's chairs in the days before the fire, because of an argument. Two days later, Blevins saw appellant burning Nall's whicker table on the deck, again due to an argument between appellant and Nall. Blevins saw appellant use a Benzomatic torch to light the fire and Blevins later tried to put that fire out with a garden hose. Blevins knew appellant would burn Nall's things when he was mad at her. Appellant had previously threatened to burn the house down on multiple occasions.

{¶11} On August 3, Blevins woke up around 7:30 a.m. and began to make breakfast for himself and appellant. He saw appellant begin to go down to the basement, but when appellant noticed Blevins watching him, appellant hesitated with a "deer in the headlights" look. Appellant turned around and did not enter the basement at that time.

{¶12} Soon after, appellant began arguing with Nall. During the argument, Blevins heard appellant say, "you have no idea what I was about to do." Nall told appellant to leave. Blevins said appellant did not leave immediately but was still in the house for about 10 minutes. Blevins said everyone else in the house went upstairs after appellant and Nall argued. Blevins was in his room with Perfetti when he heard Nall scream "oh my god, he set my house on fire." Blevins went to wake Miller and then went down the stairs. He said the stairs were already hot under his feet.

4

Case No. 2022-L-061

{¶13} Blevins explained that the house was built on the location of an old farmhouse and had an old cellar with an entrance to the cellar from the garage. There were two entrances to the basement, one from inside the house and one from the garage. He said a person could go into the garage and access the basement from there.

{¶14} Blevins acknowledged prior convictions for possession of drugs, failure to comply with an order of a police officer, and misdemeanor theft. At the time of trial, Blevins was incarcerated. He said he left the scene of the fire before emergency responders arrived because he had outstanding arrest warrants. Blevins said he lost all of his personal belongings in the fire.

{¶15} Both Blevins and Miller testified that appellant did not keep his personal belongings at 7488 Southwood.

{¶16} Angela Perfetti testified as follows: she and Blevins were in a relationship and lived at 7488 Southwood together. Nall and appellant had been arguing on August 3 and Nall went into the bathroom to avoid appellant. Soon after, Perfetti heard Nall say the house was on fire. She left the scene of the fire with Blevins because he had arrest warrants. Perfetti said she lost all of her personal belongings in the fire. Perfetti acknowledged her prior convictions for drug possession and falsification.

{¶17} Rebecca Nall testified as a court's witness thusly: she and her estranged husband, David Nall, bought the house at 7488 Southwood. The two did not have a mortgage on the house and did not maintain homeowner's insurance. She picked furniture or other valuable items from businesses or from the curb on residential trash nights. She refinished and sold the items she found. Some of the furniture she had picked

5

was burned before the fire, but she said she did not see who did it. One of the items she had picked and restored was a Victoria's Secret dresser. It was in the basement at the time of the fire. It, and all other contents in the basement, had been ruined when the basement flooded.

{¶18} On the evening of August 2 to the morning of August 3, Nall and appellant went to nearby neighborhoods to pick for items left out for trash and later returned to 7488 Southwood. After returning, Nall went to sleep but appellant woke her up and the two argued. Nall said that once the fight ended, she was trying to avoid appellant because she was scared of him.

{¶19} Nall denied that appellant threatened her. She acknowledged telling appellant he "terrified me." However, she did not remember whether he responded, "you have no idea what I was about to do" or if he said, "what do you think I'm going to do." She said he hadn't "done anything to make me scared of him" the day of the fire. After the fire, Nall gave a written statement to the police. In that statement, she wrote that appellant had said "'you have no idea what I was about to do,' over and over again * * * indicating it was going to be bad, worse than anything he's done." However, at trial, Nall attributed her written statement to a lack of sleep, the high emotions and stress of the day. That, she said, was not how she felt during her testimony. At trial, she likewise minimized appellant's prior statements about burning the house down, saying that appellant had told her "after an argument probably at least a year prior that after we made up he goes, I thought about burning your house down." In her testimony, she said she did not view this as a threat because he said he thought about doing it and had told her this

6

after they had made up. She then admitted appellant had contacted her after the fire to persuade her to testify that appellant never threatened to burn the house down and to disclaim her written statement to the police.

{¶20} On August 3, she "100 percent believed" appellant set her house on fire. However, she later changed her belief and reconnected with appellant. She feels there was no physical evidence to tie appellant to the crime. When pressed about the inconsistencies in her prior statements and her testimony, the State asked, "how can we believe anything you're saying?" Nall responded, "You shouldn't."

{¶21} A neighbor, Judy Fulton, testified as follows: she lives next to 7488 Southwood Drive and can see the house from her window. On August 3, she was in her bedroom and heard yelling coming from 7488 Southwood. She said she could not recall what the yelling was about, but that it was loud enough that she was concerned and went downstairs. Downstairs, she was able to see smoke coming out of the roof and she called 911 to report the fire. After calling 911, Fulton heard Nall loudly say, "you set my f****** house on fire."

{¶22} Another neighbor, Kathy Dziemianzuk, testified that she lives directly across the street from 7488 Southwood. On August 3, Fulton contacted her to alert her to the fire. Dziemianzuk ran outside and saw black smoke coming out of the window above the garage and the kitchen near the garage. She saw Nall frantic and running out of her house carrying her dog in her arms. She approached Nall and Nall said, "my f****** boyfriend set my house on fire." She said Nall was referring to a man she had never personally met,

7

but who she knew as "Tito" from seeing him at 7488 Southwood. She identified appellant as the man Nall was talking about.

{¶23} Appellant drove a red SUV, which had been at 7488 Southwood before the fire. Dziemianzuk's house has security cameras set up which captured appellant's vehicle in the driveway and depicted appellant entering his vehicle and leaving the premises almost immediately before smoke began to exit the residence.

{¶24} Kevin Butsko, a firefighter and fire investigator for the Mentor Fire Department, testified about his involvement in investigating the fire at 7488 Southwood. According to Butsko, the fire department responded to the scene of the fire at 9:14 a.m. and the fire was under control by 11:45 a.m. Butsko began his investigation shortly thereafter. He said he found a gas can and burned materials outside of the house which had not been part of the structure fire. He found no evidence that the fire was caused in the kitchen or by an electrical short.

{¶25} Officer Matt Alvord, of the Mentor Police Department, responded to the 911 call reporting a fire at 7488 Southwood. Based on information gathered at the scene, Alvord and other officers went to appellant's place of work, a Costa oil change shop. Appellant was arrested around 9:50 a.m. and his car was towed. Upon appellant's arrest, Alvord recovered his clothing as evidence.

{¶26} Edward Elek, a former manager at Costa Oil, testified about appellant's employment at the time of the fire. He said appellant's first day on the job was scheduled for August 3, 2021. He said employees are supposed to arrive by 9:00 a.m. but appellant

8

arrived at 9:13 a.m. Elek said no customers had yet arrived, so he told appellant to sweep and clean up around the shop.

{¶27} Detective John Stirewalt, of the Mentor Police Department, searched appellant's vehicle on August 4. He recovered several items from the vehicles which could have been used as accelerants in starting a fire. Stirewalt recovered a butane torch and Bic lighter from the center console as well as a can of WD-40. He also recovered the top half of a torch, which screws onto the fuel source although he did not find a fuel source for the torch in the car. Stirewalt also recovered a number of other flammable items from the vehicle such as brake fluid, car waxes, greases, oils, spray paint, and glue. On cross-examination, he agreed someone working as an auto mechanic would likely possess many of these items.

{¶28} Lieutenant Brad Kemp, of the Lake County Narcotics Agency, investigated the possibility that a methamphetamine lab explosion caused the fire at 7488 Southwood. He testified that the cost of producing crystal methamphetamine in small batches actually exceeded the cost to buy crystal methamphetamine on the street. He found no indication of crystal methamphetamine production at 7488 Southwood. However, Kemp did not investigate the basement.

{¶29} The State called Lt. Gordon Thompson, of the Painesville Township Fire Department. Thompson also acts as a fire inspector for the township and is an accelerant detection K9 handler with the Bureau of Alcohol, Tobacco, and Firearms. He testified that his dog is trained to detect trace amounts of ignitable liquids that are typically left after a fire. He uses the dog to rule out cases of arson. Gasoline is the most common, readily

available, liquid used as an accelerant in arson cases. However, the K9 cannot detect non-liquid accelerants such as paper products.

{¶30} He went to the scene of the fire with his K9 on August 3. He arrived while units were still battling the fire. He was able to run through the house soon after the fire was extinguished. His K9 falsely alerted to the presence of accelerants in the basement near a mass of melted objects, likely because the items were melted plastic and may have emitted an odor resulting in a false positive. The K9 also alerted to the presence of ignitable liquids on a pair of jeans and boots that appellant had been wearing at the time of his arrest. Those items were sent for further testing.

{¶31} Detective Christian Lawrence, of the Mentor Police Department, took photographs of 7488 Southwood. They showed the heavy fire and smoke damage in the residence after the fire had been extinguished. One of photographs showed debris on the floor of the basement. Among the debris was a can of lighter fluid. Lawrence also found a gas can in the garage which he photographed and secured as possible evidence.

{¶32} During the investigation, one of the house residents claimed that an air return vent had been intentionally blocked with a t-shirt. Lawrence returned to the residence on September 16, to verify this claim. Lawrence did find a t-shirt stuffed into a bedroom air return vent. Nathan Carey, a forensic analysis at the Lake County Crime Lab, performed fire debris analysis and analysis for ignitable liquids. He analyzed the clothing recovered from appellant and determined there was the presence of ignitable liquids on appellant's boots, but did not detect the presence of ignitable liquids on appellant's other clothing. Carey determined the ignitable liquid present on the boots was gasoline. He also

Case No. 2022-L-061

tested the mass of melted objects found in the basement, however he found no detectible ignitable liquids.

**{¶33}** Rebecca Silverstein, a forensic analyst at the Lake County Crime Lab, performed fingerprint analysis on a butane can and a gas can recovered from the house, but she was not able to develop any usable fingerprint results. However, she said factors such as heat or water can impact the ability to identify fingerprints on an object. Likewise, Leann Suchanek, a DNA analyst at the Lake County Crime Lab, performed a DNA analysis but her tests did not result in enough DNA to identification or comparison.

**{¶34}** Genevieve Bures, the owner of Bures Consultants, testified about her investigation of the fire at 7488 Southwood. Bures went to the home on March 1, 2022. In general, she said a fire accelerant,

> can be just about anything. An accelerant can be a bag of potato chips. You'd be surprised how quickly they burn. It could be wax paper. Most people think of an accelerant right away and they think of a chemical like gasoline or toluene. But an accelerant is anything that makes a fire move faster. In today's society most of our clothes are manmade, which means they're based on petroleum oddly enough. They'll burn very quickly.

**{¶35}** She added that draperies, furniture, and carpeting are often made from petroleum products.

**{¶36}** Bures found no indication that natural gas was responsible for the fire, that it resulted from an electrical issue in the home, or that it was caused by a household appliance.

**{¶37}** Bures opined the fire had two points of origin: the pantry and the basement under the center window of the north wall. Neither point of origin had a natural ignition

11

source and the two points of origin were unrelated to each other. She said the burn damage in the basement indicated the fire did not breach onto the main floor of the house and that they were "two unconnected fires." According to Bures, the fires "were set by human hand," although she neither could nor did opine on who set the fire. She added this was a dangerous fire because it spread into the wall underneath the main stairwell in the house. She opined that the shirt stuffed into the air vent would slow smoke from entering a room.

{¶38} The State introduced a picture of the basement taken before the fire and asked Bures if a pink Victoria's Secret dresser in that picture could act as an accelerant. Appellant objected to the question and the trial court overruled the objection. Bures said the dresser can "[m]ost certainly" act as an accelerant. Supporting this conclusion, she said it "looks like it's made out of material. Aside from wood, but I meant the pink and white panels look like they're material. * * * Could be a manmade material which would be, it would be petroleum based."

{¶39} Detective Brian Yenkevich, of the Mentor Police Department, testified to his investigation of the fire. Yenkevich arrested appellant at the Costa Oil shop. Yenkevich said appellant never asked why he was placed in custody. After his arrest, Yenkevhich interviewed appellant and the video of that interview was admitted into evidence.

{¶40} Yenkevich reviewed the neighborhood security video and testified as to the contents of the video. The video showed appellant walk out of the house at 8:07 a.m. and then engage in indeterminate activity outside and in the garage. At 8:35 a.m., appellant moved his car in the driveway and remained there for several minutes. At 8:42 a.m.,

12

appellant exited his vehicle, walked back to the garage, and entered the house. At 8:59 a.m., appellant walked out of the garage, entered his vehicle, and drove away at 9:00 a.m. Smoke from 7488 Southwood becomes visible on the security video at 9:06 a.m. and people exit the house at 9:07 a.m. The first emergency responders arrived at 9:12 a.m.

{¶41} Appellant did not call any witnesses on his behalf. The jury found appellant guilty on both counts.

{¶42} The trial court sentenced appellant on June 13, 2022. The two counts merged for sentencing purposes, and appellant was convicted on one count of Aggravated Arson, in violation of R.C. 2909.02(A)(1). The trial court sentenced appellant to an indefinite prison term of 11 to 16-and-one-half years in prison, was ordered to pay restitution, and given notice of his duty to register as an arson offender.

{¶43} Appellant timely appealed raising two assignments of error.

**Assignments of Error and Analysis**

{¶44} Appellant's first assignment of error states:

{¶45} "[1.] THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT ALLOWED THE STATE OF OHIO'S EXPERT TO TESTIFY AS TO WHETHER AN OBJECT WAS AN ACCELERANT WITHOUT LAYING A FOUNDATION AS TO THE NATURE/COMPOSITION OF THE ITEM AND LAYING A FOUNDATION FOR THE BASIS OF THE EXPERT'S OPINION."

{¶46} Appellant argues the trial court erred when it allowed Bures to testify that the Victoria's Secret dresser could act as an accelerant because Bures did not test the

13

dresser to determine its composition. Appellant argues that there was no evidence of a liquid accelerant at the scene and the testimony regarding the dresser was critical to the State's case to prove appellant used an accelerant. He further contends that proof appellant used an accelerant is critical to the State's case.

{¶47} The determination of the admissibility of expert testimony is within the discretion of the trial court." *Valentine v. Conrad*, 110 Ohio St.3d 42, 2006-Ohio-3561, ¶ 9. We will not disturb such a decision absent an abuse of discretion. *Id.*

{¶48} "'The term "abuse of discretion" is one of art, connoting judgment exercised by a court which neither comports with reason, nor the record.' *State v. Underwood*, 11th Dist. Lake No. 2008-L-113, 2009-Ohio-208, ¶ 30, citing *State v. Ferranto*, 112 Ohio St. 667, 676-678, [148 N.E. 362] (1925)." *State v. Raia*, 11th Dist. Portage No. 2013-P-0020, 2014-Ohio-2707, ¶ 9. Stated differently, an abuse of discretion is "the trial court's 'failure to exercise sound, reasonable, and legal decision-making.'" *Id.*, quoting *State v. Beechler*, 2d Dist. Clark No. 09-CA-54, 2010-Ohio-1900, ¶ 62, quoting Black's Law Dictionary 11 (8th Ed.Rev.2004). "When an appellate court is reviewing a pure issue of law, 'the mere fact that the reviewing court would decide the issue differently is enough to find error[.] * * * By contrast, where the issue on review has been confined to the discretion of the trial court, the mere fact that the reviewing court would have reached a different result is not enough, without more, to find error.'" *Id.*, quoting *Beechler* at ¶ 67.

{¶49} Relevant evidence is generally admissible unless otherwise provided in the rules of evidence or by law. Evid.R. 402. Evid.R. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence

14

to the determination of the action more probable or less probable than it would be without the evidence." Relevant evidence must be excluded where the "probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A). Relevant evidence "may be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence." Evid.R. 403(B).

{¶50} Evid.R. 702 provides an expert witness may testify if all of the following apply:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information.

{¶51} Here, Bures' testimony described the origin point of the basement fire based on specialized knowledge beyond the scope of a lay person and she was qualified to opine on the origin of the fire based on her skill and experience in fire investigation. Her testimony dispelled common misconceptions about the nature of accelerants and she explained to the jury that an accelerant can be "anything that makes a fire move faster." She especially highlighted how manmade, petroleum based products burn very quickly. She said petroleum based products are common in modern homes and can include items like drapery and furniture. Therefore, she said that many common household items have the potential to act as an accelerant because they can cause a fire to move faster.

15

{¶52} The State asked Bures to opine on whether the Victoria's Secret dresser could be an accelerant. The item itself had been severely burned in the fire and Bures identified the area where the dresser was found as the origin point of the basement fire. Further, the dresser belonged to Nall. The State elicited other testimony about the dresser to suggest appellant had a reason to burn that item in particular because he had burned other pieces of Nall's furniture.

{¶53} Bures did not test the dresser or take a sample from it. But, based on the photograph, she opined that the dresser's "pink and white panels *look like* they're material. * * *Could be* a manmade material which would be, it would be petroleum based." (Emphasis added)

{¶54} The main thrust of Bures' testimony was to explain how fires start and spread and to provide her opinion that this fire was man-made and had two points of origin. Bures' testimony about the dresser was a minimal part of her overall testimony. More importantly, the testimony about the dresser was conditional because she said the dresser could have manmade components on it which would be petroleum based. Based on her conditional opinion the item had manmade elements, she believed the dresser could be an accelerant. This answer was consistent with her prior explanation of common household accelerants and was based on her specialized knowledge and experience.

{¶55} The trial court did not abuse its discretion when it determined Bures' expert testimony was admissible.

{¶56} Assuming arguendo the trial court erred by admitting Bures' testimony about the dresser, such error was harmless. Where, as here, the defendant has objected to a

16

Case No. 2022-L-061

claimed error in the trial court, if that error did not "affect substantial rights" it "shall be disregarded on appeal." Crim.R. 52(A); *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio 297, 802 N.E.2d 643, ¶ 15.

{¶57} The harmless error standard is "'significantly more favorable to the defendant.'" *Id.*, quoting *United States v. Curbelo*, 343 F.3d 273, 286 (4th Cir. 2003). Under a harmless error standard, the government bears the burden of demonstrating that the error did not affect the substantial rights of the defendant. *Id.* "An appellate court must reverse a conviction if the government does not satisfy this burden * * *." *Id*. "Whether the defendant's substantial rights were affected depends on whether the error was prejudicial, i.e., whether it affected the outcome of the trial." *State v. Jones*, 160 Ohio St.3d 314, 2020-Ohio-3051, 156 N.E.3d 872, ¶ 18, citing *State v. Fisher*, 99 Ohio St.3d 127, 2003-Ohio-2761, 789 N.E.2d 222, ¶ 7. Where the State fails to meet its burden, the appellate court must reverse the conviction. *Perry* at ¶ 15.

{¶58} Bures' testimony about the dresser did not affect the outcome of the trial. The State was not required to prove the use of an accelerant and could have proved its case without her testimony about the dresser's status as an accelerant. As discussed in more detail below in reference to the manifest weight of the evidence, the evidence in this case was clear. Although Bures' testimony was important, the testimony about the dresser did not affect the outcome of the trial.

{¶59} Accordingly, appellant's first assignment of error is without merit.

{¶60} "[2] THE JURY ERRED IN FINDING MR. ORTIZ GUILTY AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

17

Case No. 2022-L-061

{**¶61**} When evaluating the weight of the evidence, we review whether the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other indicated clearly that the party having the burden of proof was entitled to a verdict in its favor, if, on weighing the evidence in their minds, the greater amount of credible evidence sustained the issue which is to be established before them. "Weight is not a question of mathematics but depends on its effect in inducing belief." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). Whereas sufficiency relates to the evidence's adequacy, weight of the evidence relates to the evidence's persuasiveness. *Id.* The reviewing court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App. 3d 172, 175, 485 N.E.2d 717 (1st Dist. 1983).

{**¶62**} The trier of fact is the sole judge of the weight of the evidence and the credibility of the witnesses. *State v. Landingham*, 11th Dist. Lake No. 2020-L-103, 2021-Ohio-4258, ¶ 22, quoting *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964). The trier of fact may believe or disbelieve any witness in whole or in part, considering the demeanor of the witness and the manner in which a witness testifies, the interest, if any, of the outcome of the case and the connection with the prosecution or the defendant. *Id.,* quoting *Antil* at 67. This court, engaging in the limited weighing of the evidence introduced

at trial, is deferential to the weight and factual findings made by the factfinder. *State v. Brown*, 11th Dist. Trumbull No. 2002-T-0077, 2003-Ohio-7183, ¶ 52, citing *Thompkins* at 390 and *State v. DeHass,* 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph two of the syllabus.

**{¶63}** A finding that a judgment is supported by the manifest weight of the evidence necessarily means the judgment is supported by sufficient evidence. *State v. Arcaro*, 11th Dist. Ashtabula No. 2012-A-0028, 2013-Ohio-1842, ¶ 32.

**{¶64}** Appellant was convicted of Aggravated Arson, in violation of R.C. 2909.02(A)(1). The State was required to prove that appellant "by means of fire or explosion" knowingly created "a substantial risk of serious physical harm to any person other than the offender." A person acts knowingly "regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B). A substantial risk "means a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(8).

> 'Serious physical harm to persons' means any of the following:
>
> (a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;
>
> (b) Any physical harm that carries a substantial risk of death;
>
> (c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

19

(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

**{¶65}** Appellant argues that his conviction is against the manifest weight of the evidence because the conviction was based entirely on circumstantial evidence and did not "prove collateral facts and circumstances from which the existence of the primary fact may be rationally inferred according to common experience." *State v. Windle*, 11th Dist. Lake No. 2010-L-033, 2011-Ohio-4171, ¶ 34. He asserts his conviction was improperly based on a series of stacked inferences without giving appropriate weight to the actions of other parties in the residence on the day of the fire. He highlights there were no direct witnesses to who started the fire and no evidence of an accelerant being used.

**{¶66}** Bures explained the fire had two points of origin, one in the pantry and one in the basement, and determined it was set by a human hand. None of the four occupants of the house entered the basement in the minutes before the fire. Miller, Blevins, and Perfetti described the dysfunctional relationship Nall and appellant had and how they argued immediately before the fire. Blevins recalled appellant's past threats to set the house on fire and swore that appellant had previously burned some of Nall's belongings. All three described how dangerous the fire was, how hot the stairwell became, and how quickly the home filled with smoke. All residents of the home lost all their personal belongings in the fire.

**{¶67}** Although Nall denied believing appellant set the fire in her testimony, in her prior statements to the police and other individuals on August 3, 2021, she said she

20

believed appellant had set the fire. While she denied appellant had threatened to burn the house down, she acknowledged he admitted to thinking about it and she admitted that appellant scared her when they fought.

{¶68} Blevins' description of the house as having a second entrance to the basement, and the security footage showing appellant leaving the house only five minutes before smoke becomes visible support that he set the fire.

{¶69} There was no direct evidence that appellant set the fire. Yet, a conclusion that he did so did not rest on stacking inference upon inference. There was direct evidence that: the fire was set by a human hand at two points which no other occupants accessed in the minutes before the fire; appellant and Nall had a tumultuous relationship; appellant had threatened to burn Nall's house down; appellant had previously set Nall's items on fire; appellant was present in and around the house in the minutes before the fire; and the fire was dangerous, burning hot under the main stairwell, and filled the house with smoke. The jury made one inference from this direct evidence – that appellant set the house on fire. Weighing the evidence and all reasonable inferences in this case does not suggest the jury clearly lost its way. This is not the exceptional case where the evidence weighs heavily against conviction. *See Martin*, 20 Ohio App. 3d 172, 175, 485 N.E.2d 717.

{¶70} Accordingly, appellant's second assignment of error is without merit.

Case No. 2022-L-061

{¶71} For the foregoing reasons, the judgment of the Lake County Court of Common Pleas is affirmed.


MARY JANE TRAPP, J.,

MATT LYNCH, J.

concur.

Case No. 2022-L-061